UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHAKITA PERDUE,                          :

     Plaintiff,                      :

                                           CIVIL ACTION NO.

v.                                       :

                                           1:05-CV-00753-MHS

UNION CITY, GEORGIA, et al.,             :

     Defendants.                     :

## **ORDER**

Presently before the Court are defendants' motions for summary judgment as well as other pending matters. The Court's rulings and conclusions are set forth below.

Background

Plaintiff Shakita Perdue brings this civil rights action against defendants pursuant to 42 U.S.C. § 1983 for the alleged violation of her constitutional rights guaranteed under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution as well as alleged violations of state law. Plaintiff sues Union City, Georgia; Ralph Moore, in his individual capacity and his official capacity as

Mayor of Union City, Georgia; Alisa King, Helen Turner, Barbara Bohanan, and Shirley Jackson, each in their individual capacities; Edward Ski Saxby in his individual capacity and his official capacity as acting city administrator; Tremata Anthony, in her individual capacity and in her official capacity as jailer; Dr. Carlo Musso; Georgia Correctional Health, L.L.C.; and Cathy Adams. Individual defendants have raised the defense of qualified immunity.

The following facts are undisputed for the purpose of defendants' motions for summary judgment. They are drawn from defendants' statements of material facts and plaintiffs' amended responses to defendants' statements of material facts.[1]

On July 30, 2004, plaintiff snorted powder cocaine with a friend. Later that night plaintiff drank two 22-ounce cans of Colt 45 beer. Plaintiff then got into an argument with her cousin.

---

[1] Plaintiff's original responses to defendants' statements of material facts as well as plaintiff's statement of material facts violate Local Rule 56.1B. Accordingly, the Court grants defendants' motion to strike and strikes plaintiff's responses to defendants' statements of material facts and plaintiff's statement of material facts. Plaintiff has filed amended responses to defendants' statements of material facts to which no objections have been made.

AO 72A
(Rev.8/82)

Police Officer Melissa Gordon of the City of Fairburn Police Department arrived on the scene and discovered that plaintiff had an outstanding warrant. Officer Gordon attempted to arrest plaintiff. Still under the influence of alcohol and cocaine, plaintiff resisted arrest, refused to cooperate, and threatened physical harm to Officer Gordon. Plaintiff also stated on numerous occasions that she intended to commit suicide. In addition to arresting her on the outstanding warrant, Officer Gordon charged plaintiff with the following offenses: 1) loitering; 2) disorderly conduct; 3) obstruction; 4) terrorist threats; and 5) obscene language/behavior.

After approximately thirty minutes had passed and a backup officer had arrived, plaintiff was placed in a patrol car while struggling with the officers. Plaintiff kicked, screamed, and threatened to beat and kill the officers. Officer Gordon transported plaintiff to the South Fulton Regional Municipal Jail ("Jail"), and they arrived at the Jail at approximately 2:30 a.m. on July 31, 2004.

Defendant Sergeant Tremata Anthony was working at the Jail that evening. As Jail Supervisor, Sgt. Anthony was responsible for all jail operations and inmates during her shift, including supervision of subordinates, inmate welfare,

3

employee scheduling, accounting for inmates, assisting staff, ensuring proper patrols and security checks were performed, and generally dealing with any issues that might come up. She is employed by Union City and is a triple-certified police officer with certifications from the Georgia Peace Officers Standards Training Council, as a certified police officer, jailer, and detention officer.

In response to a call for assistance, Sgt. Anthony met plaintiff and Officer Gordon as they entered the Jail. When Sgt. Anthony arrived, plaintiff was yelling and using profanity. Plaintiff told Sgt. Anthony that she was under the influence of cocaine and had been drinking, that she did not use marijuana, and that Officer Gordon had charged her for the wrong thing. Upon entering the Jail, plaintiff continually cursed and swore, continued to make threats against the police officers in her presence, and made further statements of her intention to commit suicide.

Officer Gordon searched plaintiff and took her inside the Jail, where she handcuffed plaintiff to a bench in the Jail's intake area. Plaintiff continued to yell profanity, make threats, and threaten to kill herself. Plaintiff was also hitting her head against the wall. Plaintiff threatened Officer Gordon and stated that if she

4

removed the handcuffs, plaintiff was going to "beat her white ass." Pl. Dep. at 125.

Defendant Cathy Adams, a licensed practical nurse and employee of Georgia Correctional Health, LLC ("GCH"), was working in the infirmary at the Jail on July 31, 2004. GCH contracts with the Jail to provide medical services to the Jail's inmates.

Sgt. Anthony called Nurse Adams to assist with plaintiff who was threatening to kill herself and harm others. Nurse Adams immediately responded to Sgt. Anthony's request and came to the intake area. Plaintiff threatened to kill Nurse Adams and told the Jail staff that "I got something for all y'all when I get out of jail." Pl. Dep. at 68-69.

Nurse Adams placed plaintiff on suicide watch due to plaintiff's continued threats of violence against herself and others. GCH had a suicide prevention policy in effect on July 31, 2004.

5

Sgt. Anthony escorted plaintiff to a private shower area and instructed plaintiff to undress. Plaintiff repeatedly refused to remove her clothes. After several more orders from Sgt. Anthony, plaintiff undressed. Sgt. Anthony and Nurse Adams were the only other people in the room.

In the shower area, plaintiff continued to be combative, and she rolled around on the shower floor. Plaintiff finally got up after Sgt. Anthony told her that it was unsanitary.

Because plaintiff was clearly suicidal, Nurse Adams directed that plaintiff should be placed into medical gowns with no underclothes. Plaintiff put on a gown, but then she tore it off and threw it on the floor. Eventually plaintiff put on two gowns – one in the front and one in the back.

Sgt. Anthony then placed plaintiff in a holding cell, or "cage," in the intake area, so that she could be kept under constant suicide surveillance. While in the cell, plaintiff began repeatedly striking the metal bars of the cell with her fists and head. At approximately 3:00 a.m., she stripped off her gown and tied it in a knot around her neck in an attempt to commit suicide. Sgt. Anthony, Correctional

6

Officer Kevin Mathews, and Nurse Adams immediately rushed into the cell to prevent plaintiff from killing herself. Sgt. Anthony removed the gown from around plaintiff's neck to prevent plaintiff from strangling herself. Immediately thereafter, plaintiff tore off the other gown that she was wearing, again exposing her nude body.

Nurse Adams told Sgt. Anthony that plaintiff could not be brought back to the medical area until she calmed down, particularly since there was no officer available to watch her constantly if she were in a cell in the medical area. Sgt. Anthony concluded that she could not take plaintiff to the medical area if Nurse Adams would not accept her. Sgt. Anthony kept plaintiff in the intake cell in order to provide plaintiff with constant suicide surveillance and to ensure plaintiff's safety. Standard medical protocol dictated that the best place for a suicidal detainee such as plaintiff was in an area with high visibility and high staffing levels, to permit intense observation and quick access to prevent suicide attempts.

Plaintiff had braids in her hair which were composed of an artificial material woven into plaintiff's own hair. Plaintiff had previously threatened to

7

strange herself with these braids.  Plaintiff took her braids and wrapped them around her neck in an effort to commit suicide.

Nurse Adams recommended that the weaves and braids be removed, and Sgt. Anthony relied upon Nurse Adams's assessment as an expert on inmate suicide risk.  In addition, Sgt. Anthony believed removal of the braids was a prudent suicide prevention measure.  The Jail practice at that time was that inmates could not have any artificial hair implements such as weave extensions or anything that was not original hair as such items could be used as weapons or for self-harm.

Sgt. Anthony cut the braids at the bottom portion of plaintiff's neck and removed the braids from the cell.  Plaintiff continued to fight and resist the officers as well as scream obscenities and profanities.  Nurse Adams voiced her concerns about plaintiff inflicting injury to herself several times to the jail officers.

Because plaintiff continued to strike the cell with her body and demonstrated a risk of self-harm and continuing intoxication, the suggestion was

made to restrain plaintiff to keep her from harming her hands or head.[2] Therefore, Sgt. Anthony decided to place plaintiff in a restraint chair inside the cell.

At approximately 3:15 a.m., Sgt. Anthony and at least one other officer strapped plaintiff nude into the restraint chair. Plaintiff continued to thrash about in the chair. Officers later reported to Sgt. Anthony that plaintiff was now attempting to chew through the Velcro straps across her torso. Sgt. Anthony therefore went outside, placed pepper spray on a napkin, and then wiped the pepper spray doused napkin on the outer portions of the restraint straps where plaintiff had attempted to bite them. Plaintiff never complained to Sgt. Anthony about any effects of the pepper spray.

Throughout the next couple of hours, plaintiff continued to scream obscenities and make threats concerning suicide and harm to the officers. During the three hours plaintiff remained in the restraint chair, several officers complained to Sgt. Anthony that plaintiff should not be allowed to remain nude

---

[2] Both plaintiff and Sgt. Anthony state that Nurse Campbell made the suggestion to place plaintiff in the restraint chair. However, both also state that Nurse Campbell did not arrive at the Jail until almost three hours later. Therefore, it is unclear to the Court who actually made the suggestion to place plaintiff in the restraint chair.

AO 72A
(Rev.8/82)

in the restraint chair under circumstances where male guards and/or male prisoners could possibly view her naked body. At some point, one of the shift officers asked Sgt. Anthony if a blanket could be placed over plaintiff. Sgt. Anthony checked with Nurse Adams, but Nurse Adams instructed that only a suicide blanket[3] could be placed in the cell because of plaintiff's violent and suicidal state of mind. Sgt. Anthony was similarly concerned that plaintiff could use a blanket or other articles to harm herself. There was no suicide blanket found in the Jail on the day of the incident. Instead, jail officials put a blanket on the top of the cell. The blanket hung over the cell partially, but plaintiff could still see other individuals outside the cell.

At approximately 6:00 a.m., Nurse Alene Campbell, also an employee of GCH, arrived to relieve Nurse Adams. After observing plaintiff, Nurse Campbell determined that plaintiff was okay and advised Sgt. Anthony that plaintiff needed to be taken to the infirmary. At approximately 6:30 a.m., Sgt. Anthony removed plaintiff from the restraint chair, placed a blanket around her, and escorted her to the medical area. Plaintiff was no longer disruptive at the time Nurse Campbell

---

[3] A suicide blanket is made out of a heavy material that pretrial detainees cannot tear, ingest, or use to choke themselves. It is similar to a radiation gown used by dentists.

AO 72A
(Rev.8/82)

accepted her into the infirmary. Sgt. Anthony stayed in the infirmary with plaintiff and Nurse Campbell for ten to fifteen minutes to make sure plaintiff was not going to lash out or be disruptive again. Sgt. Anthony warned Nurse Campbell about plaintiff's attempt to kill herself with a gown, and Nurse Campbell accepted custody and responsibility for plaintiff. Apparently deciding plaintiff was not suicidal or dangerous at that point, Nurse Campbell gave plaintiff medical gowns to put on. Sgt. Anthony left plaintiff in the infirmary under Nurse Campbell's care, and Nurse Campbell monitored plaintiff while she was in the infirmary. Plaintiff did not require medical treatment while in the infirmary. Plaintiff has not sought nor obtained any medical or psychological treatment following the incident.

Regarding the events that took place on July 31, 2004, plaintiff recalls writing out a signed statement for an investigator within a few days of the incident, and she contends she truthfully and accurately related the events. In that statement, dated August 2, 2004, plaintiff wrote that she was "acting crazy so Mrs. Anthony told me to come and take off my cloth and she put me on a paper gown and I take it off and put it around my neck and her and two more officers came and got it off [generally sic]." Def's Exh. 1 to Pl.'s Dep. Plaintiff also testified that

11

she guesses she tried to kill herself but that she doesn't remember. Plaintiff had been to Jail before this incident and had seen Sgt. Anthony. Plaintiff never had a conflict with Sgt. Anthony, has no reason to believe that Sgt. Anthony had anything against her, and has had no subsequent dealings with Sgt. Anthony since her incarceration.

There was a policy in effect at the Jail which required that Sgt. Anthony contact her supervisor, Lt. McGhee, to advise him of the situation involving plaintiff and request his direction. However, Sgt. Anthony never contacted Lt. McGhee to advise him of plaintiff or to seek his direction regarding her. Following the incident, an internal affairs investigation initiated by Union City concluded that Sgt. Anthony had violated Jail policies and procedures in several regards. As a result, Sgt. Anthony's employment with Union City was terminated.

Also on the date in question, Union City was party to an agreement with the South Fulton Municipal Jail Authority wherein Union City agreed to manage and operate the Jail consistent with the terms and conditions of said agreement. Also on this date, defendant Edward Ski Saxby was employed as the Acting Interim City Manager for Union City. Defendant Saxby as well as the Union City City

Council members, played no role whatsoever in formulating, approving, or reviewing policies and procedures applicable at the Jail.

Defendant Dr. Carlo Musso is the president of GCH. Dr. Musso opined that based on his twenty years of experience as an emergency room doctor and correctional medicine doctor, plaintiff presented an "extraordinarily difficult management challenge" to the Jail staff because of her multiple substance abuse and multiple suicide attempts. Dr. Musso Dep. at 120-22. Based on the Jail staff's increasing levels of restraint and precautions in response to plaintiff's continuing violent and suicidal behavior, Dr. Musso concluded that the measures taken to secure plaintiff and ensure her safety were reasonable under the extreme circumstances. Psychiatrist Paul Ginn, who has worked for most of his career in the prison mental health field, confirms that an officer's primary concern and focus for a suicidal detainee must be protecting the detainee from herself. Both Drs. Musso and Ginn agree that the proper focus regarding plaintiff's care and custody was to keep her safe until the intoxications wore off and plaintiff became more manageable.

13

Now pending before the Court are defendants' motions for summary judgment.

## Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The movant bears the initial responsibility of asserting the basis for his motion. Celotex, 477 U.S. at 323; Apcoa, Inc. v. Fidelity National Bank, 906 F.2d 610, 611 (11th Cir. 1990).  However, the movant is not required to negate his opponent's claim.  The movant may discharge his burden by merely "'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325.  After the movant

14

has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." Id. at 324. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is material when it is identified by the controlling substantive law as an essential element of the non-moving party's case. Anderson, 477 U.S. at 248. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. Id. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable"

15

or is "not significantly probative."  <u>Anderson</u>, 477 U.S. at 249-50.   Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of <u>every</u> element material to that party's case so as to create a genuine issue for trial.


<u>Discussion</u>

I.  Claims Against Individual Defendants: Sgt. Anthony & Nurse Adams[4]

To state a claim for relief under 42 U.S.C. § 1983, plaintiff must establish that she was deprived of a right secured by the Constitution or laws of the United States, and that the person who committed this alleged deprivation acted under color of state law.  <u>Focus on the Family v. Pinellas Suncoast Transit Authority</u>, 344 F.3d 1263, 1277 (11th Cir. 2003); <u>Patrick v. Floyd Medical Center</u>, 201 F.3d 1313, 1315 (11th Cir. 2000).

---

[4] Plaintiff has also sued Union City Council Members, Mayor of Union City Ralph Moore, acting city administrator Edward Ski Saxby, and Dr. Musso, each in their individual capacities.  Plaintiff has pointed to no evidence to establish individual liability against any of these defendants for the alleged violation of plaintiff's constitutional rights.

16

A.  Constitutional Violation

The Court must isolate the precise constitutional violation that has allegedly occurred.  Graham v. Connor, 490 U.S. 386, 394 (1989).  Plaintiff's complaint states simply that the "intentional deprivation of plaintiff's liberty, and cruel and unusual punishment violated the rights of plaintiff as guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution."  Compl. at ¶ 48.  The parties' Joint Preliminary Report and Discovery Plan states that the legal issues to be tried are the "intentional cruel and unusual punishment as prohibited by the 14th Amendment via the 8th Amendment to the U.S. Constitution . . . (the intentional and cruel punishment committed by defendants) . . .[and] whether the Defendants violated Plaintiff's rights as a detainee under the Eighth and Fourteenth Amendments."  Joint Preliminary Report and Scheduling Order at 1(c).


The U.S. Supreme Court has made it clear that if a constitutional claim is covered by a specific constitutional provision, then the Court must analyze the claim under the standard appropriate to that specific provision.  Graham, 490 U.S. at 394; Raspberry v. Johnson, 88 F. Supp. 2d 1319, 1328-29 (M.D. Ala. 2000).

17

It is not clear to the Court, nor to the parties, which specific constitutional provision plaintiff alleges under the Fourth, Eighth, and/or Fourteenth Amendments.

### i. Eighth Amendment

As an initial matter, no party has contested that plaintiff was a pretrial detainee when the events occurred. The Eighth Amendment does not apply to plaintiff because the Cruel and Unusual Punishment Clause was designed to protect those convicted of crimes. Whitley v. Albers, 475 U.S. 312, 318 (1986); Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003). Accordingly, because plaintiff was a pretrial detainee and had not yet been convicted of any crimes, the Court grants defendants' motions for summary judgment on plaintiff's Eighth Amendment claims.

### ii. Fourth Amendment

Plaintiff has alleged in her complaint that her Fourth Amendment rights were violated. However, as a pretrial detainee, plaintiff's claims are governed by the Fourteenth Amendment, and not the Fourth Amendment. Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). Plaintiff has not made any claims regarding

18

her arrest, and the events in this case took place after the arresting officer had turned plaintiff over to Jail officials.  Moreover, plaintiff does not respond to the arguments made by defendants' in their motions for summary judgment regarding plaintiff's Fourth Amendment claims.

The only statement plaintiff makes regarding her Fourth Amendment rights is that the Eleventh Circuit has left open the question whether a pretrial detainee may assert an excessive force claim under the Fourth Amendment.  See Vineyard v. County of Murray, 990 F.2d 1207, 1212 (11th Cir. 1993).  Plaintiff does not, however, argue that her pretrial detainee excessive force claim should be analyzed under Fourth Amendment standards nor does she provide any analysis in support of a Fourth Amendment pretrial detainee excessive force claim.

The Court concludes that the application of the Fourth Amendment to plaintiff's pretrial detainee excessive force claim is not appropriate.  See Cottrell, 85 F.3d at 1490.  Furthermore, plaintiff has not pointed the Court to any U.S. Supreme Court, Eleventh Circuit, or Georgia Supreme Court case holding that the Fourth Amendment creates a cause of action for a pretrial detainee complaining of excessive force.  Therefore, even if plaintiff, a pretrial detainee, could proceed

19

with an excessive force claim under the Fourth Amendment, Sgt. Anthony would be entitled to qualified immunity because the law was not clearly established at the time the events in this case occurred.[5]   See Jordan v. Cobb County, Georgia, 227 F. Supp. 2d 1322, 1336-38 (N.D. Ga. 2001).

### iii. Fourteenth Amendment

Pursuant to the Fourteenth Amendment, a pretrial detainee could allege that the defendants were deliberately indifferent to her serious medical needs, Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985), challenge the conditions of her confinement, Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004), or state a claim of excessive force, Bozeman v. Orum, 422 F.3d 1265 (11th Cir. 2005). The Court is unclear which claim plaintiff intended pursuant to the Fourteenth Amendment.

The Court's confusion stems from not only plaintiff's failure to articulate the constitutional provision applicable to her claims, but also from the briefs submitted to the Court on defendants' motions for summary judgment. Both Sgt. Anthony and plaintiff confuse and conflate an excessive force claim and a

---

[5] See infra for a further discussion of qualified immunity.

conditions of confinement challenge as well as the standards used for these different claims. For example, Sgt. Anthony assumes plaintiff seeks to challenge the conditions of her confinement but then applies part of the standard for an excessive force claim in analyzing plaintiff's claim. Sgt. Anthony then objects to plaintiff raising an excessive force claim. In response, plaintiff states that she is pursuing an excessive force claim but then uses part of the standard for a challenge to the conditions of her confinement in analyzing her claim.

With regard to Sgt. Anthony's objection to plaintiff's excessive force claim, she argues that plaintiff's complaint does not sufficiently assert a cognizable force-based claim in violation of the heightened pleading standards for individual capacity § 1983 claims. Plaintiff filed the complaint approximately a year and half ago, and at this point the parties have attended mediation and engaged in discovery. Sgt. Anthony never asserted a heightened pleading defense in her answer, and she neither filed a motion to dismiss nor a motion for a more definite statement. Instead, Sgt. Anthony delayed until she filed her motion for summary judgment to object to any excessive force claim. In addition, although Sgt. Anthony objects to the excessive force claim, she partly addresses it by analyzing plaintiff's conditions of confinement challenge under part of the excessive force

21

standard.  The Court overrules the objection and finds that it is too late at this

stage of the proceedings for Sgt. Anthony to raise an objection based on a failure

to adhere to the heightened pleading standard.  See Morris v. Wallace Community

College-Selma, 125 F. Supp. 2d 1315, 1334 (S.D. Ala. 2001).


Contrary to the parties' briefs, there is a distinction between an excessive

force claim and a challenge to the conditions of confinement.  The Fifth Circuit

has specifically addressed this issue and concluded that "excessive force claims

by pretrial detainees should not be analyzed under Bell's condition of confinement

standard."  Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir. 1993) (referring

to the standard set by the U.S. Supreme Court in Bell v. Wolfish, 441 U.S. 520

(1979), for analyzing a condition of confinement claim).  District courts have also

specifically recognized the distinction between an excessive force claim and a

conditions of confinement challenge.  Cotney v. Franklin, No. 2:03-CV-1181-

FWO, 2005 WL 1514047 (M.D. Ala. June 24, 2005); Telfair v. Gilberg, 868 F.

Supp. 1396 (S.D. Ga. 1994).  In addition, the Eleventh Circuit has not used Bell's

condition of confinement standard to evaluate a pretrial detainee's excessive force

claim.  See Bozeman, 422 F.3d at 1271-72; Carr v. Tatangelo, 338 F.3d 1259,

1269-74 (11th Cir. 2003); Lumley, 327 F.3d at 1196.

The Court "may not infer claims other than those that plainly appear on the face of the complaint to defeat a defense of qualified immunity." GJR Investments, Inc. v. County of Escambia, Fla., 132 F.3d 1359, 1367-69 (11th Cir. 1998). However, because Sgt. Anthony and plaintiff have addressed both an excessive force claim and a conditions of confinement challenge and because the complaint is ambiguous as to which constitutional provision plaintiff intended, the Court will analyze plaintiff's Fourteenth Amendment allegations under both an excessive force claim and a condition of confinement claim. See Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1378 (M.D. Ga. 2001) (noting that the Court could have inferred the constitutional claim the plaintiffs intended if there was ambiguity as to the constitutional basis and if the plaintiffs argued that their claims were based on certain constitutional grounds); see O'Neal v. DeKalb County, Ga., 850 F.2d 653, 656 n.4 (11th Cir. 1988). In doing so, the Court notes that it is not inferring a new claim from plaintiff's complaint, but instead is resolving the ambiguity that arises from plaintiff's complaint and the parties' briefs. See Lepone-Dempsey v. Carroll County Comm'r, 159 Fed. Appx. 916, 918 n.4 (11th Cir. 2005); cf. GJR Investments, Inc., 132 F.3d at 1367-69 (finding district court erred by divining an equal protection claim from the complaint when the plaintiff did not allege unequal treatment or discriminatory motive).

Meanwhile, defendants Dr. Musso, GCH, and Nurse Adams also move for summary judgment and argue that plaintiff is asserting a claim pursuant to the Fourteenth Amendment for deliberate indifference to her serious medical needs. Plaintiff does not respond to this argument, and instead argues against these defendants with respect to her excessive force and conditions of confinement claims. The Court treats plaintiff's silence on the issue, along with her arguments proceeding under an excessive force claim and a conditions of confinement challenge, as evidence that plaintiff did not intend to proceed against defendants on a deliberate indifference to serious medical needs claim. Therefore, any claim against defendants pursuant to the Fourteenth Amendment based on defendants' alleged deliberate indifference to serious medical needs is moot.

iv. Right to Bodily Privacy and Failure to Intervene

In her response to defendants' motions for summary judgment, plaintiff alleges that Sgt. Anthony and Nurse Adams violated her right to bodily privacy and that Sgt. Anthony violated her rights by failing to intervene when Nurse Adams directed that plaintiff be put in the restraint chair and pepper sprayed. Sgt. Anthony objects to both of these claims and argues that plaintiff cannot rely on

these theories because they were not raised in the complaint or disclosed in discovery.

The Court agrees. Unlike Sgt. Anthony's objection to plaintiff's excessive force claim which was made too late, Sgt. Anthony's objection to these new claims is valid. Plaintiff cannot change her theory of the case and allege claims not raised in the complaint in an effort to avoid summary judgment after defendants have already moved for summary judgment. Gilmour v. Gates, McDonald and Co., 382 F.3d 1312 (11th Cir. 2004); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1138 (N.D. Ga. 1997). Plaintiff does not mention a right to bodily privacy or a failure to intervene anywhere in her complaint, the Joint Preliminary Report and Scheduling Order, or in her response to Sgt. Anthony's Interrogatory Requests. Moreover, the cases plaintiff relies on for her right to bodily privacy claim deal with facts not analogous to those in this case and concern prisoners, not pretrial detainees. See Boxer X v. Harris, 437 F.3d 1107 (11th Cir. 2006); Fortner v. Thomas, 983 F.2d 1024 (11th Cir. 1993). The binding cases plaintiff relies on for her failure to intervene claim deal with facts not analogous to those in this case and discuss a failure to intervene claim in the context of an arrestee's Fourth Amendment rights. See Priester v. City of Rivera

Beach, 208 F.3d 919, 925 (11th Cir. 2000) (arrestee attacked by police dog); Byrd v. Clark, 783 F.2d 1002 (11th Cir. 1986) (failure to intervene arises when an unprovoked beating occurs in the officer's presence). Finally, the Court allowed plaintiff's excessive force and conditions of confinement claims to proceed because both plaintiff and Sgt. Anthony had addressed and confused the two claims and plaintiff's complaint was ambiguous. However, the Court would be impermissibly divining new claims from the complaint if the Court were to allow plaintiff's right to bodily privacy and failure to intervene claims to proceed. See GJR Investments, Inc., 132 F.3d at 1369. Finally, even if the Court allowed plaintiff to proceed with these claims, the Court would find that plaintiff has failed to produce evidence to support these claims and that defendants would be entitled to summary judgment.

### 1. Excessive Force

To prevail on plaintiff's excessive force claim pursuant to the Fourteenth Amendment, plaintiff must show that defendants' conduct "shocks the conscience." Lumley, 327 F.3d at 1196. To meet this standard, the conduct must "offend even hardened sensibilities" and will be only the "most egregious official conduct." Carr, 338 F.3d at 1271 n.23. In evaluating whether a pretrial detainee's

excessive force claim meets this standard, the Court looks to several factors including: (1) the need for force; (2) the amount of force used; and (3) the extent of injury inflicted.  Id.  Finally, "whether or not a prison guard's application of force is actionable turns on whether that force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Bozeman, 422 F.3d at 1271.

Viewing all evidence and factual inferences in the light most favorable to plaintiff, Sgt. Anthony cut plaintiff's braids, placed her nude in a restraint chair, and rubbed a pepper spray doused napkin on the straps on the restraint chair.  Sgt. Anthony believed removing the braids was a prudent suicide prevention measure. She was following Jail practice to remove artificial items, such as weave extensions, which could cause harm, and relied on Nurse Adams's assessment of an inmate's suicide risk.  According to plaintiff, Sgt. James Hall of the Union City Police Department conducted an internal investigation and determined that Sgt. Anthony used excessive force in cutting plaintiff's hair because plaintiff was held to the ground, kicking and flailing, as Sgt. Anthony cut her hair.[6]  Plaintiff

---

[6]  In a footnote, plaintiff explains that the video tape viewed by Sgt. Hall which documents the events that took place was subsequently lost or misplaced.  Plaintiff states that
(continued...)

continued to fight and resist the officers as well as scream obscenities and profanities.  Plaintiff testified that she could not remember if her hair was cut with scissors or a knife.  Plaintiff has not pointed to any evidence that she suffered any injury from Sgt. Anthony cutting her hair.  Finally, there is no evidence that Sgt. Anthony cut her hair for the purpose of causing her harm.  Instead, after plaintiff had threatened to commit suicide and had wrapped her braids around her neck, Sgt. Anthony then cut her hair as a prudent suicide prevention measure.

At this point, plaintiff was nude because she had wrapped one gown around her neck and torn off the other gown.  Sgt. Anthony decided to place plaintiff in a restraint chair inside the cell because plaintiff continued to strike the cell with her body and demonstrated a risk of self-harm and continuing intoxication.  According to plaintiff, she was naked in the chair with her feet handcuffed to the

---

[6](...continued)
according to the theory of spoliation the Court can conclude that the loss of the tape by Union City and the Jail creates the presumption that the evidence would have been harmful to defendants.  However, this presumption arises only when the destruction of the evidence was intentional or done in bad faith.  Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997); see also 29 Am. Jur. 2d Evidence § 244 (1994).  Although plaintiff states that the "spoliator" was the Union City police and the Jail, there is no evidence that any defendant destroyed or tampered with the tape or any indication of bad faith by defendants.  Therefore, the Court will not make an adverse inference from the lost tape.  Penalty Kick Management Ltd. v. Coca Cola Co., 318 F.3d 1284, 1294-95 (11th Cir. 2003); Bashir, 119 F.3d at 931.

28

bottom of the chair and her hands handcuffed to the top of the chair with the chair belts going across her chest. Plaintiff has not alleged that she suffered any injury from the chair restraints. According to plaintiff, after placing her in the chair, Sgt. Anthony mocked and jeered at plaintiff and sang a popular rap song with lyrics that indicated that no one was going to get plaintiff out. Although this behavior may have been inappropriate or unprofessional, there is no evidence that Sgt. Anthony placed plaintiff in the chair maliciously or sadistically with the purpose of causing plaintiff harm.

After officers reported to Sgt. Anthony that plaintiff was attempting to chew threw the velcro straps of the chair across her torso, Sgt. Anthony went outside and sprayed a napkin with the pepper spray. She then returned inside and wiped the pepper spray doused napkin on the straps. Plaintiff never complained to Sgt. Anthony about the effects of the pepper spray. However, according to plaintiff, when she awoke the next day about mid-morning, she noticed two lines on her chest where the pepper spray had burnt her. The lines were red, and they itched and burned. The redness from the lines lasted a couple of days. Plaintiff testified that she requested treatment for the redness on her chest and received some cream that relieved her symptoms a bit. Plaintiff further testified that she did not get any

AO 72A
(Rev.8/82)

other medical treatment for anything else that she believed was associated with being in the restraint chair or during the events of that night. Plaintiff has pointed to no evidence that Sgt. Anthony wiped down the restraint straps with pepper spray maliciously or sadistically, but instead the undisputed facts show that Sgt. Anthony did this in order to deter plaintiff from chewing the straps.

The Court concludes that Sgt. Anthony's conduct of cutting plaintiff's braids, placing her in the restraint chair, and applying pepper spray to the straps does not "shock the conscience" or rise to the level of the most egregious conduct. Instead, plaintiff posed a serious threat to herself and others. She not only told jail officials that she was considering suicide, but also actually took steps towards trying to kill herself. She repeatedly threatened to harm jail officials and struck the cell with her body. The injuries plaintiff received from being in the chair were minimal. Although plaintiff may dispute the reasonableness of the particular use of force against her, there is no evidence that Sgt. Anthony restrained plaintiff maliciously or sadistically for the very purpose of causing harm. See Lumley, 327 F.3d at 1196 (strapping pretrial detainee to hospital bed because he was a flight risk and had escaped from prison did not amount to conduct that "shocks the conscience"); Campbell v. Sikes, 169 F.3d 1353, 1374-77 (11th Cir. 1999), (jail

officials' use of "L" shaped restraint and straightjacket on prisoner when prisoner posed a serious threat to herself and others, had tried to harm herself, made threats to hurt someone, and when the restraints caused plaintiff no physical injury, did not amount to excessive force); cf. Bozeman, 422 F.3d at 1271-72 (officers' continued use of force after the threat from the pretrial detainee had subsided was for the very purpose of causing harm).

As to Nurse Adams, plaintiff contends that a jury could find that Nurse Adams directed Sgt. Anthony to place plaintiff in the restraint chair and apply the pepper spray. However, although Nurse Adams may have recommended placing plaintiff in a restraint chair and although Sgt. Anthony relied on Nurse Adams as an expert in assessing plaintiff's suicide risk with regard to placing plaintiff under constant surveillance and removing all harmful objects, the undisputed facts show that Sgt. Anthony made the decision to place plaintiff in the restraint chair and apply the pepper spray. Plaintiff has not pointed the Court to evidence to show that Nurse Adams directed Sgt. Anthony to take these actions. Moreover, even if Nurse Adams directed Sgt. Anthony's conduct, the conduct still does not rise to the level of "shocks the conscience" so as to sustain plaintiff's excessive force claim. Plaintiff testified that she overheard Nurse Adams say to Sgt. Anthony that

31

she would "kick her teeth out" and refer to plaintiff as a "black bitch." Pl. Dep. at 69. Although this may have been inappropriate and unprofessional, there is no evidence that Nurse Adams used force against plaintiff or acted maliciously with the intent of causing plaintiff harm. Accordingly, the Court finds that Sgt. Anthony and Nurse Adams did not violate plaintiff's constitutional rights with regard to her excessive force claim.

### 2. Conditions of Confinement

Due process requires that a pretrial detainee not be punished at all prior to a lawful conviction. Bell, 441 U.S. at 536; McMillian v. Johnson, 88 F.3d 1554, 1564 (11th Cir. 1996). To determine whether a condition of pretrial detention amounts to punishment, the Court must determine whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate governmental purpose. Bell, 441 U.S. at 538; Magluta, 375 F.3d at 1273. If a restriction or condition is not reasonably related to a legitimate goal, such that it is arbitrary or purposeless, the Court may permissibly infer that the purpose of the governmental action is punishment. Bell, 441 U.S. at 539; Magluta, 375 F.3d at 1273. Finally, the Court evaluates pretrial detainee complaints against the totality

32

of the confinement conditions to determine if there is a constitutional deficiency. Wilson v. Blankenship, 163 F.3d 1284, 1292 (11th Cir. 1998).

Plaintiff has not pointed to any evidence that Sgt. Anthony or Nurse Adams intentionally imposed the restrictions against plaintiff for the purpose of punishing her. Instead, the undisputed facts show that Sgt. Anthony took actions to prevent plaintiff from harming herself and others after plaintiff had continued to fight with officers, scream obscenities, and threaten to kill herself and harm officers.

Nurse Adams concluded that plaintiff could not be taken to the medical area because there was no officer to come with her. Therefore, Sgt. Anthony placed plaintiff into the cell to provide plaintiff with constant suicide surveillance and to ensure plaintiff's safety.

Plaintiff exposed her body by removing one medical gown and tying it around her neck and tearing off the other gown. Furthermore, in accordance with the Jail's policy regarding suicide, plaintiff was not allowed to have any clothing or object which could be used in a suicidal manner.

33

The suggestion to place plaintiff in a restraint chair arose after plaintiff continued to strike the cage with her body and demonstrated a risk of self-harm and continuing intoxication.  After plaintiff began chewing on the straps of the chair, Sgt. Anthony applied a napkin that had been sprayed with pepper spray to the restraint chair straps.

Sgt. Anthony testified that an officer asked her if plaintiff could be covered. Sgt. Anthony checked with Nurse Adams because plaintiff was still under suicide watch.  According to Sgt. Anthony, plaintiff was still being irate, verbal, and lashing out. Therefore, Nurse Adams made the decision not to cover up plaintiff. Sgt. Anthony testified that she did not want to give plaintiff a blanket to cover her because she feared that plaintiff would try to do something with the blanket in a further attempt to harm herself. In addition, only a suicide blanket could be placed in the cell because of plaintiff's violent and suicidal state of mind, but there was no suicide blanket found in the Jail on the day of the incident. Instead, plaintiff testified that a Jail official put a blanket on the cell, covering the cell partially. Plaintiff testified that she saw police officers bring two men into the Jail, and these men were able to see plaintiff while she was nude in the restraint chair.

34

Turning to the issue of legitimate government objectives, in addition to securing the detainee's presence at trial, "the effective management of the detention facility once the individual is confined is a valid objective that may justify the imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." <u>Bell</u>, 441 U.S. at 540. Sgt. Anthony argues that she had a shift of five (5) officers to supervise over three hundred inmates, and two (2) of her officers could not leave their observation posts. Sgt. Anthony contends that she had to make decisions on how to best allocate jail resources, that plaintiff was not the only inmate requiring attention that night, and that when dealing with plaintiff, the officers could not necessarily take care of their other duties. Sgt. Anthony argues that strapping plaintiff into the restraint chair was related to the legitimate government interest of protecting plaintiff from self-harm, maintaining security, and restoring jail operations that had been disrupted by plaintiff. Given the scarce resources of the jail that evening, Sgt. Anthony contends that strapping plaintiff in the chair was not an exaggerated response to the problems she posed, and that her own violent and self-destructive misconduct initiated her nudity and made the restraints and removal of clothing necessary. In response, plaintiff argues that there was no

penological interest in leaving plaintiff nude in the restraint chair when plaintiff could not harm herself or others.

After viewing the facts and all evidence in the light most favorable to plaintiff and considering plaintiff's situation against the totality of the confinement conditions, the Court concludes that plaintiff's conditions of confinement were reasonably incidental to the legitimate government objectives of maintaining security, protecting plaintiff from self-harm, and effectively managing a detention facility that had scarce resources. The restrictions against plaintiff were not purposeless or arbitrary but imposed in response to plaintiff's actions. There is no evidence that Sgt. Anthony or Nurse Adams intentionally imposed these restrictions against plaintiff for a punitive purpose. Accordingly, the Court finds that Sgt. Anthony and Nurse Adams did not violate plaintiff's constitutional rights with regard to her conditions of confinement challenge.

## B. Qualified Immunity

Sgt. Anthony and Nurse Adams have raised a qualified immunity defense. "Qualified immunity offers 'complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established

statutory or constitutional rights of which a reasonable person would have known.'" Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir.2001)) (additional quotations omitted).

Although Nurse Adams acted under color of state law for purposes of § 1983, as a private employee of GCH, she is not entitled to qualified immunity. Hinson v. Edmond, 192 F.3d 1342, 1345 (11th Cir. 1999) (declining to extend qualified immunity to privately employed prison physicians); Farrow v. West, 320 F.3d 1235, 1239 n.3 (11th Cir. 2003) (private physician who is under contract with a state to provide medical services acts under color of state law). However, having found that Nurse Adams did not violate plaintiff's constitutional rights, Nurse Adams is not liable despite her inability to defend on qualified immunity grounds.

The parties do not dispute that Sgt. Anthony was acting within her discretionary authority, and therefore plaintiff bears the burden to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194. However, having found that the evidence would not support a reasonable jury's finding that plaintiff's constitutional rights were violated, the Court need not address the

37

applicability of qualified immunity to Sgt. Anthony. Id.; Campbell, 169 F.3d at

1361. Moreover, plaintiff has failed to meet her burden to show that Sgt. Anthony

is not entitled to qualified immunity on her excessive force and conditions of

confinement claims.

III. Municipality Liability:  Union City & GCH

     Plaintiff alleges that Union City failed to train Sgt. Anthony and failed to

implement policies to prohibit plaintiff from being viewed by members of the

opposite sex.  She further alleges that GCH and Dr. Musso failed to properly train

Nurse Adams.  Plaintiff has also sued Mayor Ralph Moore, Edward Ski Saxby

acting as City Administrator, and Dr. Musso in their official capacities.[7]  These

claims are considered a suit against Union City and GCH, the local entities each

public official represents.  Vineyard, 990 F.2d at 1210 n.3.

     Section 1983 applies to municipalities and other local government entities.

Monell v. New York City Dep't of Soc. Serv., 436 U.S. 658 (1978).  GCH is a

private corporate entity that had contracted with the Jail and the City of Union

---

[7] On November 29, 2005, the Court dismissed plaintiff's claims against the Union City
Council Members in their official capacities after plaintiff stated that she abandoned her claims
against these defendants.

City, Georgia, to provide medical services to inmates.  As a private entity, when GCH contracts with the state to provide medical services to inmates, it is treated as a municipality for § 1983 purposes.  <u>Swann v. Southern Healthy Partners, Inc.</u>, 388 F.3d 834, 837 (11th Cir. 2004); <u>Wilkes v. Clayton County, Ga.</u>, No. 1:05CV3074GET, 2006 WL 1992613, at * 3 (N.D. Ga. July 14, 2006)(GCH is treated as a municipality).

A municipality may not be held liable on a theory of respondeat superior or vicarious liability pursuant to § 1983.  <u>Davis v. DeKalb County School Dist.</u>, 233 F.3d 1367, 1375 (11th Cir. 2000).  Instead, plaintiff must identify municipal policy or custom that caused plaintiff's injury.  <u>Id.</u>  When a plaintiff asserts a § 1983 claim against a municipality, there is a two step analysis: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."  <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 120 (1992); <u>Wyke v. Polk County Sch. Bd.</u>, 129 F.3d 560, 568 (11th Cir. 1997).

Having found that neither Sgt. Anthony nor Nurse Adams violated plaintiff's constitutional rights, the Court need not consider any policy or custom of Union City or GCH.  <u>See</u> <u>Rooney v. Watson</u>, 101 F.3d 1378, 1381-82 (11th Cir.

1996)("an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred"); Vineyard, 990 F.2d at 1211 (noting that "[o]nly when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise").

IV. State Law Claims: Negligence and Intentional Infliction of Emotional Distress

Plaintiff stated a claim for negligence in her complaint.   Although defendants moved for summary judgment against plaintiff on this claim, plaintiff did not respond to their arguments and stated that "this is not a case of negligence." Pl.'s Resp. Brief at 71.  Accordingly, plaintiff has abandoned any claim of negligence. Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598-99 (11th Cir. 1995); Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994).

Plaintiff has also stated a claim for intentional infliction of emotional distress and alleges that defendants intentionally treated plaintiff in a manner that was extreme, outrageous, and unjustified, causing plaintiff to suffer physical and emotional distress for which defendants are individually liable.

AO 72A
(Rev.8/82)

To establish an intentional infliction of emotional distress, plaintiff must prove the following: (1) conduct must be intentional or reckless; (2) conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. Johnson v. Allen, 272 Ga. App. 861, 865 (2005).  The law will only intervene where the distress is so severe that no reasonable person could be expected to endure it.  Id.  Whether plaintiff's claim rises to a sufficient level of outrageousness or egregiousness is a question of law for the Court.  Id.

Sgt. Anthony argues that she is entitled to official immunity.  The Georgia Constitution provides that state officers "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const., art. I, § 2, ¶ IX(d).  Therefore, plaintiff must show that Sgt. Anthony was acting with actual malice, which requires a deliberate intention to do wrong and denotes "express malice or malice in fact." Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1333 (11th Cir. 2006) (quoting Adams v. Hazelwood, 271 Ga. 414, 520 S.E.2d 896, 898 (1999)). Plaintiff has not produced evidence from which a reasonably jury could infer that Sgt. Anthony had a deliberate intention to do wrong sufficient to satisfy the actual

41

malice standard. Therefore, Sgt. Anthony is correct that she is shielded by official immunity from plaintiff's state law claims.

Moreover, plaintiff has not pointed to any evidence to show that she actually suffered any distress. She testified that she did not seek any type of medical treatment for any of her alleged injuries, and besides receiving cream for the burns on her chest, she did not seek any medical treatment for anything else that was associated with her being in the restraint chair or during the events of the night. Plaintiff has not alleged or produced evidence that she suffered any physical or pecuniary loss as a result of the incident. Without any evidence of a loss, plaintiff must show that the conduct of defendants was malicious, wilful, or wanton. Hill v. City of Fort Valley, 251 Ga. App. 615, 617 (2002); see also Travis Pruitt & Assoc., P.C. v. Hooper, 277 Ga. App. 1, 5 (2005). There is no evidence that any defendant acted maliciously, willfully, or wantonly towards plaintiff. Therefore, plaintiff has failed to present evidence that would allow a reasonable jury to find that she suffered severe distress. See Perrin v. The City of Elberton, Georgia, No. 3:03-CV-106(CDL), 2005 WL 1563530, at *13 (M.D. Ga. July 1, 2005); Hill, 251 Ga. App. at 617.

## V. Punitive Damages

Plaintiff alleges a claim for punitive damages against all defendants. With regard to plaintiff's claim against Union City and GCH, punitive damages are not available against a municipality in a § 1983 action. <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 271 (1981). With regard to the individual defendants, the Court has found no culpable conduct on the part of defendants, and therefore plaintiff's claim for punitive damages fails. <u>Colonial Pipeline Co. v. Brown</u>, 258 Ga. 115, 118 (1988).

Accordingly, the Court grants defendants' motions for summary judgment.

## Conclusion

For the foregoing reasons, the Court GRANTS defendant Tremata Anthony's motion for leave to file excess pages [#104]; GRANTS defendant Union City and Individual City Council Member's motion for summary judgment [#110]; GRANTS defendant Sgt. Anthony's motion for summary judgment [#112]; GRANTS defendants Dr. Musso, GCH, and Nurse Adams' motion for summary judgment [#113]; GRANTS plaintiff's motion for leave to file excess pages [#124]; GRANTS defendants Dr. Musso, Georgia Correctional Health,

43

LLC, and Nurse Adams' motion to strike [#129]; and STRIKES (1) plaintiff's response in opposition to defendants Dr. Carlo Musso, Georgia Correctional Health, LLC, and Cathy Adams' Statement of Material Facts as to which there is no genuine issue to be tried in regard to defendants' motion for summary judgment [#122], (2) plaintiff's response in opposition to defendant Tremata Anthony's Statement of Material Facts as to which there is no genuine issue to be tried in regard to defendants' motion for summary judgment [#121], (3) plaintiff's response in opposition to defendants Union City, Georgia, Ralph Moore, Alisa King, Helen Turner, Barbara Bohanan, Shirley Jackson, and Edward Ski Saxby's Statement of Material Facts as to which there is no genuine issue to be tried in regard to defendants' motion for summary judgment [#123]; and (4) plaintiff's statement of material facts in dispute in regard to defendants' motion for summary judgment [#125].  This action is hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED, this 28th day of August, 2006.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

AO 72A
(Rev.8/82)